STRANGE *v.* WRIGHTSVILLE AND TENNILLE RAIL-
ROAD COMPANY.

Where an engineer, whose duty it was to run a train from a point
    where it had been made up on to the main line of a railroad and thence
    to its destination, left his ordinary post of duty and went upon the
    tender, and while returning to the engine, which was going around a
    curve at a speed of about fifteen miles an hour, received an injury
    which could not have happened except for his going upon the tender,
    and where the evidence failed to show that his duty called him there,
    or that he was directed to go there by any person having authority to
    give such command, in an action brought by his widow to recover for
    his homicide, a nonsuit was properly granted.

Argued June 15, 1909.—Decided January 12, 1910.

Action for damages. Before Judge Rawlings. Washington su-
perior court. September 8, 1908.

Winnie S. Strange brought an action against the railroad com-
pany for the homicide of her husband. Two witnesses were intro-
duced—the wife of the deceased and his son. The son testified, in
brief, as follows: My father was an engineer in the employment
of the Wrightsville & Tennille Railroad Company. While on his
engine in that capacity, he was hurt on the 13th day of November,
1905. On the 22d of November, 1905, he died. When I saw my
father on the occasion of the injury he was in the act of coming
down from the tender into the cab of the engine, and had gotten
out of my sight before he was hurt, the tender being between him
and me. The tender was piled up pretty high with wood—I sup-
pose two, two and a half, or three feet in the center. There is a
wanter-tank which runs around the tender from one end to the
other, and extends on the front of the tender next to the engine.
In going from the tender into the engine he had to go over the
water-tank next to the engine. The customary way for a person to
go down from the tender into the engine is to go over the end of the
tank and step on the running board, holding to the cab of the en-
gine, and from there down to the footboard. My father was going
down in that way, with his face toward the engine, the last I saw
of him. Immediately after that he was hurt. I got to him a
minute or two minutes after he was hurt. While he was the en-
gineer to run that engine that day, at the time he was hurt he was
not running it. Mr. Bowers, who was the master mechanic for the
Wrightsville & Tennille Railroad, was running the engine when the

injury occurred. My father's right hip was knocked out of place. He was unable to walk, and they took him on a stretcher and carried him to the house. I saw, after he reached the house, how he was injured. The position in which he was caught caused his hip bone to be pressed backwards, making the leg on that side shorter. Later there appeared signs of being badly bruised all on his side and thigh and on his leg and the lower part of the stomach. My father died from the injuries he received; and though he lingered until the 22d of November, he never did get up out of bed. He was fifty-four years old at the time of his death, and up to that time his health had been good. He had a strong constitution. The train on which he was when hurt was being run from the Central Railroad track to the Wrightsville & Tennille track, and when the injury occurred it was on the Wrightsville & Tennille track about fifty yards from where the two tracks join. There was some curve in the track at the point where the injury occurred, a sharp curve. My father was on the inside of the curve. The water-tank goes all around the tender; but right in front there is an opening between the two sides about two and a half feet wide. Any one getting down from the tender into the engine could not, on that occasion, get down into that opening, for it was completely filled with wood. They had to run "pretty lively" to make the grade with the heavy train, and I think it was running at fifteen miles an hour. As my father started down into the space between the tender and the engine, and as he got out of sight, the master mechanic immediately shut off the steam entirely. "Judging from the motion of the man's hand, the steam on this occasion was shut clean off. I saw his hand, and I think the steam was shut clean off." The effect of shutting off the steam entirely on the engine and tender, and their motion, would be to bring them together. The shutting off of the steam would not have the effect of stopping the train right then, but it would stop as soon as the motion could be affected. The steam was shut off because the engine slipped. I don't know whether it was necessary for the steam to be shut off entirely or not. I don't think it was. Whenever an engine slips, it is necessary to shut off the steam in order for the wheels to grip the rails again, and then to reapply the steam; but it wasn't necessary to shut it "clean off," for this purpose. You want to keep enough steam in the cylinders to keep the momentum up and keep out of the way of

the cars, but I couldn't tell how much that would be. Shutting off the steam would not have the effect of causing the train to stop its speed, but would have that effect upon the engine. My father could not have gotten down off the tender without putting his foot on the foot-board of the engine, except by running more risk. He might have done it, but it was more dangerous. He might have gotten down on the other side, but it would have been the same as on the side where he did get down. On the opposite side of the curve it would not have closed in on him; it would have opened, I suppose. However, he would have had to have crawled over the wood, to have gotten down on the other side from the side where he was. The wood was piled up, and he was coming around one side. He could have gotten over on either side of it; but if a man had attempted to cross that wood the whole thing would be liable to slip off. To shut off the steam entirely reduces the speed of the engine, and the tender will collide with it; to shut it off partially keeps the engine moving out of the way and prevents the jar, and keeps them apart. The speed that morning of that train was about what it usually is when it is carried out. My father was thoroughly familiar with the track, the grades, the curves, the engine and loads it would carry. I didn't see my father go up on the tender. He was up there on that side of the tender when I saw him—on the inside of the curve. The shutting off of the steam partially would have the effect to slacken the speed of the train, but it would keep the engine moving enough to keep out of the way of the train. It is true if the steam is shut off entirely the engine would not stop right away, but it would slacken up enough to let the train run up against it. If shut off partially it would not do that; it would slacken up some, but would not cause any compact. When an engine slips, the proper way is to shut off the steam only partially.

The testimony of the wife was in regard to the extent of the injury. Mortality and annuity tables were introduced. A nonsuit was granted, and the plaintiff excepted.

*E. L. Stephens* and *Hines & Jordan,* for plaintiff.

*Daley & Daley,* for defendant.

LUMPKIN, J. (After stating the foregoing facts.) The plaintiff's husband was an engineer in the employment of the defendant. According to her allegation, it was his duty to handle the engine and move the train from the place where it had been made up to

the track of the defendant and on to its destination. According to the testimony of his son, he was the engineer of that engine, "and was to run it that day, but at the time my father was hurt he was not running the engine." The master mechanic was running it. The first intimation in the evidence as to the position of the engineer was that he was not on the engine proper, but was on top of the wood, which was piled in the tender, and on one side of it. The plaintiff recognized that this was not the normal place for an engineer, and alleged, in her petition, that he was subject to the orders of the master mechanic; that while he was in his proper place and at his post of duty, the master mechanic took charge of the engine and took his place as engineer; that by the command of the master mechanic, and with his knowledge, her husband got on the tender of the engine for the purpose of placing safely a piece of wood, which was about to fall from it to the track, and which might derail the train; and that after the wood had been properly placed, the master mechanic called to him and instructed him to return to the engine. It was not denied that the engineer was subject to the orders of the master mechanic; but the other allegations as to why he went upon the tender were not admitted. No evidence was introduced to show any command on the part of the master mechanic for the engineer to go upon the tender and handle the wood there; nor was any necessity shown for him to do so, or any duty on his part to be at that place. The evidence did not show whether or not there was a fireman on the engine. In returning from the tender to the engine, while it was going around a curve, at a speed of about fifteen miles an hour, he attempted to get down from the tender to the engine on the inner side of the curve. The master mechanic, who was running it, shut off the steam, wholly or partially, apparently because the engine was slipping. The witness thought, from the motion of his hand, that he shut it off entirely. The tender and engine came together on the inside of the curve, and the plaintiff's husband received an injury which resulted in his death. It is clear that he would not have been injured if he had remained on his engine, instead of going upon the wood in the tender. The plaintiff's own allegations and evidence indicated that this was not his usual and proper place. She alleged a reason why he went upon the tender, but failed entirely to introduce any proof on that subject. Under the plaintiff's own showing the case falls within the

ruling in *Atlanta and Charlotte Air-Line Ry. Co.* v. *Ray*, 70 *Ga.* 674 (4). See also *Chattanooga Southern R. Co.* v. *Myers*, 112 *Ga.* 237 (37 S. E. 439). Having been injured while seeking to return to the engine from the tender, where the evidence failed to show he had any duty or reason to be, and it being evident that except for the fact that he was endeavoring to make this alteration of position while the engine was moving around a curve he would not have been hurt, a nonsuit was properly granted.

*Judgment affirmed. All the Justices concur, except Evans, P. J., disqualified.*